J. W. TUCKER, *Appellee*, v. THE MISSOURI PACIFIC
RAILWAY COMPANY, *Appellant*.

No. 16,208.

SYLLABUS BY THE COURT.

1. MAXIMUM RATES—*Transportation of Oil—Title of Act.* Chapter 353 of the Laws of 1905 (Gen. Stat. 1909, §§ 7163-7165), establishing maximum rates for the transportation of oil, contains but one subject, which is clearly expressed in its title.

2. ——— *Statutory Damages Not a Fine for Breach of a Penal Law.* The damages recoverable by an aggrieved shipper under the act referred to do not constitute a fine for the breach of a penal law, which must go to the school fund under section 6 of article 6 of the constitution.

3. ——— *"Single-line Rates"—"Double-line Rates."* The distinction between "single-line rates" and "double-line rates" in the act mentioned is between rates for shipment over a single line and rates for shipment over more than one line.

4. ——— *Segregation of Transportation of Oil from Transportation of Other, Commodities.* The legislature was justified in segregating the transportation of oil from the transportation of other commodities, in making it the subject of special regulation, and in securing observance of such regulations by the imposition of special penalties.

5. ——— *Reasonableness of Rates — Judicial Investigation.* The act referred to does not either in express terms or by implication forbid a judicial investigation of the reasonableness of the rates fixed by the legislature, and the question is open for determination by any court in which the carrier may be called to account.

6. ——— *Same.* An opportunity to test once for all in a single suit against some officer or board the reasonableness of legislative rates is not essential to the protection of a carrier asserting that such rates are unreasonable. It is sufficient

that the carrier can not be made to suffer the penalties prescribed until the question of reasonableness has been passed upon by a competent court.

7. ——— *Penalties Not Oppressive—Intimidation.* The penalties prescribed by the act in question are not so oppressive that their natural effect is to intimidate carriers from resorting to the courts to test its validity.

8. ——— *Proof that Rates are Unreasonable.* Acts of the legislature fixing rates for transportation by common carriers will not be held to be unconstitutional on the ground that the rates established are unreasonable without the fullest disclosure of all material facts affecting the question.

9. ——— *Same.* The evidence in this case is not sufficient to show that the oil rates fixed by the act of 1905 are unreasonable.

Appeal from Osborne district court; RICHARD M. PICKLER, judge. Opinion filed March 12, 1910. Affirmed.

*Charles H. Nicholas,* and *B. P. Waggener,* for the appellant.

*Richard H. Towne,* and *J. W. Tucker,* for the appellee.

The opinion of the court was delivered by

BURCH, J.: The plaintiff recovered a judgment of $500 against the defendant for a violation of chapter 353 of the Laws of 1905 (Gen. Stat. 1909, §§ 7163-7165), establishing maximum rates for the transportation of oil. The defendant appeals, and contends the statute violates the constitution of the state of Kansas and the constitution of the United States. The title of the act reads as follows:

"An act to establish maximum rates for the transportation of crude oil and the products thereof, to forbid rebates, and provide penalties for the violation thereof."

Section 1 fixes maximum rates for the transportation of oil within the state of Kansas by single- and by

double-line shipments. Section 2 contains the following provisions:

"Every common carrier which shall fail or refuse to accept for shipment or to properly ship or deliver the products named in section 1 hereof, or which shall demand, exact or receive for such transportation or delivery any sum in excess of the rates herein made lawful, shall be liable to any person injured thereby in the sum of five hundred dollars as liquidated damages, to be recovered by action in any court of competent jurisdiction, together with a reasonable attorney's fee, to be fixed by the court."

Section 3 makes the giving of rebates a misdemeanor, punishable by fine and forfeiture of the right to do business.

The defendant claims the title and the body of the act are multifarious. It is plain, however, that a single subject is embraced—the regulation of rates for the transportation of oil and its products—and the statute extends no further than is necessary for efficient regulation. It would be a lame statute if it contained no penalty for its violation. Both civil and criminal remedies may be employed to that end. The remedy by way of damages to the aggrieved shipper is not a fine for a breach of a penal law in the sense of section 6 of article 6 of the state constitution, which provides that moneys derived from that source shall go to the school fund.

It is said the statute denies the defendant the equal protection of the laws guaranteed by the federal constitution because shipments over more than two lines of road are not regulated. This is an unwarranted interpretation of the terms "single-line rates" and "double-line rates" used in the statute. The distinction is between rates for shipment over a single line and rates for shipment over more than one line.

It is said that the act in question discriminates between classes of shippers, and favors oil shippers with liquidated damages and attorney fees which are denied

to farmers, stockmen and many other persons engaged in reputable pursuits. The carrier in this case is not a shipper and has no legal right to question the classification of members of a group to which it does not belong. It is also said that the statute discriminates between the defendant and other litigants in the matter of attorney fees. There is nothing in the abstract to show that the plaintiff recovered attorney fees, so the defendant has nothing to complain about in that respect. In view of the defendant's argument, however, it may be observed that for many well-understood reasons, which need not be rehearsed here, the legislature was clearly justified in segregating the transportation of oil from the transportation of other commodities, in making it the subject of special regulation, and in securing observance of such regulations by the imposition of special penalties. All common carriers of oil, including pipe lines (Laws 1905, ch. 315; Gen. Stat. 1909, §§ 3961-3965) are placed under the liabilities complained of, which satisfies the constitutional provisions which the defendant invokes.

The statute referred to relating to the transportation of oil by pipe lines establishes maximum rates for the service. It then gives the board of railroad commissioners authority to fix rates not to exceed those prescribed by the legislature, and provides that the reasonableness of rates fixed by the board may be tested by proceedings in any court of competent jurisdiction. Until the board acts the legislative rates are to stand. The act furnishing the basis of the proceedings under consideration contains no provision for a court review of the rates which it promulgates. From these facts the defendant argues that no right of review exists, and that consequently it is deprived of the equal protection of the laws and of property without due process of law.

The pipe-line act merely expresses a condition which

15—82 KAN.

attaches to all statutes fixing rates or charges for public services unless the legislature has by specific declaration, or by implication equally clear, forbidden an inquiry into the matter of reasonableness. The act in question merely proceeds upon the basis that in the judgment of the legislature the maximum rates established are reasonable. *Prima facie,* this conclusion is correct, but there is no intimation that a judicial investigation of the fact of reasonableness is foreclosed, and such an investigation may be made in any proceeding in which a carrier is called to account under the act. It is true that under the pipe-line act the reasonableness of rates fixed by the board of railroad commissioners may be tested once for all in an appropriate action against the board. The right to a judicial determination of the question of reasonableness, however, is the matter of essence and substance, and not the method of procedure; and so long as the defendant can not be made to suffer until a competent court has passed upon the justice of the legislative rates the guaranties of the federal constitution are not infringed.

Finally it is said that the legislative rates are in effect made conclusive because the penalties for violating the law are great enough to terrorize carriers into submitting rather than to take the chances of succeeding in a test case. This argument is based on the decision in the case of *Ex parte Young,* 209 U. S. 123. The tenor of that decision is shown by the following extracts from the opinion:

"For disobedience to the freight act the officers, directors, agents and employees of the company are made guilty of a misdemeanor, and upon conviction each may be punished by imprisonment in the county jail for a period not exceeding ninety days. Each violation would be a separate offense, and, therefore, might result in imprisonment of the various agents of the company who would dare disobey for a term of ninety days each for each offense. Disobedience to the passenger-rate act renders the party guilty of a felony and sub-

Tucker v. Railway Co.

ject to a fine not exceeding five thousand dollars or imprisonment in the state prison for a period not exceeding five years, or both fine and imprisonment. The sale of each ticket above the price permitted by the act would be a violation thereof. It would be difficult, if not impossible, for the company to obtain officers, agents or employees willing to carry on its affairs except in obedience to the act and orders in question. The company itself would also, in case of disobedience, be liable to the immense fines provided for in violating orders of the commission. The company, in order to test the validity of the acts, must find some agent or employee to disobey them at the risk stated. The necessary effect and result of such legislation must be to preclude a resort to the courts (either state or federal) for the purpose of testing its validity. The officers and employees could not be expected to disobey any of the provisions of the acts or orders at the risk of such fines and penalties being imposed upon them, in case the court should decide that the law was valid. The result would be a denial of any hearing to the company. . . . If the law be such as to make the decision of the legislature or of a commission conclusive as to the sufficiency of the rates, this court has held such a law to be unconstitutional. *Chicago &c. Railway Co. v. Minnesota*, 134 U. S. 418. A law which indirectly accomplishes a like result by imposing such conditions upon the right to appeal for judicial relief as works an abandonment of the right rather than face the conditions upon which it is offered or may be obtained is also unconstitutional. It may therefore be said that when the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights." (Pages 145, 146, 147.)

Compared with the drastic penalties prescribed by the legislature of the state of Minnesota, those of the Kansas statute are mild indeed. The latter are not imposed upon officers, agents or employees, they affect the corporation only, are merely pecuniary, and are neither extravagant nor unreasonable. Therefore the court

holds they are not so enormous that their natural effect is to deter carriers from resorting to the courts to test the validity of the act.

At the trial in the district court the defendant was given an opportunity to show that the statutory rates are unreasonable. It introduced evidence to prove its contention to that effect. The court found otherwise, and the finding is assigned as error. The evidence consisted largely of tables of figures compiled by the defendant's statisticians, supplemented by the testimony of two witnesses. It is claimed that the evidence establishes the following facts:

"(1) The rate fixed by the statute is not compensatory, and that the actual cost of the service, not including fixed charges, or taxes, is greatly in excess of the maximum revenue allowed by the statute.

"(2) That all of the earnings combined of the company in the state, from domestic business, shows an annual loss or deficit of over $200,000.

"(3) That all of the earnings in the state, from every source, interstate and intrastate, do not show sufficient net revenue to pay to exceed two per cent on one-half of the value of the property, as assessed for taxation."

It is not necessary to analyze this evidence. Some of it is open to the suspicion of want of good faith. Thus the only showing with reference to revenue from intrastate oil shipments consists of receipts for two months of a single year, and those months are July and August. Indeed, there is nothing in the evidence showing what a reasonable rate for the transportation of oil would be or that the legislative rates are too low. The figures to the effect that the Missouri Pacific Railway Company loses money every year on its Kansas business do not tend to show either of these facts. Further suspicion is cast on this evidence by proof presented by the plaintiff showing the defendant voluntarily made double-line shipments of oil in less than carload lots to a noncompetitive point beyond the one where this controversy arose at less than the statutory rates. In the

Tucker v. Railway Co.

case of *Chicago &c. Company v. Wellman*, 143 U. S. 339, Mr. Justice Brewer pointed out how easily courts might be misled into doing grievous wrong to the public by striking down legislative rate acts on general statements and without the fullest disclosure of all material facts. In delivering the opinion of the court he said:

"A single suggestion in this direction: It is agreed that the defendant's operating expenses for 1888 were $2,404,516.54. Of what do these operating expenses consist? Are they made up partially of extravagant salaries; fifty to one hundred thousand dollars to the president, and in like proportion to subordinate officers? Surely, before the courts are called upon to adjudge an act of the legislature fixing the maximum passenger rates for railroad companies to be unconstitutional, on the ground that its enforcement would prevent the stockholders from receiving any dividends on their investments, or the bondholders any interest on their loans, they should be fully advised as to what is done with the receipts and earnings of the company; for if so advised it might clearly appear that a prudent and honest management would, within the rates prescribed, secure to the bondholders their interest and to the stockholders reasonable dividends. While the protection of vested rights of property is a supreme duty of the courts, it has not come to this, that the legislative power rests subservient to the discretion of any railroad corporation which may, by exorbitant and unreasonable salaries, or in some other improper way, transfer its earnings into what it is pleased to call 'operating expenses.'" (Page 345.)

The trial court was correct in holding that the defendant's evidence was not sufficient to prove that the statutory rate is unjustifiably low. The judgment of the district court is affirmed.